T.C. Memo. 2001-290


UNITED STATES TAX COURT


ROBERT A. AND NANCI M. SPURGIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11196-00.                    Filed November 2, 2001.


Robert A. and Nanci M. Spurgin, pro sese.

<u>Michael A. Skeen</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


DAWSON, <u>Judge</u>: This case was assigned to Special Trial Judge Robert N. Armen, Jr., pursuant to the provisions of section 7443A(b)(5) and Rules 180, 181, and 183.[1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

OPINION OF THE SPECIAL TRIAL JUDGE

ARMEN, Special Trial Judge:  On May 9, 2000, respondent issued a notice of final determination denying petitioners' claim to abate interest for the taxable year 1993.  Petitioners timely filed a petition under section 6404(i) and Rules 280-284.[2]

The issue for decision is whether respondent abused his discretion by denying petitioners' claim for abatement of interest for the taxable year 1993.  We hold that respondent did not abuse his discretion.

FINDINGS OF FACT

Many of the facts have been stipulated, and they are so found.  Petitioners resided in Irvine, California, at the time that their petition was filed with this Court.

A.  Petitioners' 1993 Tax Return and Unpaid Tax Liability

Prior to 1993, Robert Spurgin (petitioner) invested in a partnership known as "IWF North America" (IWF).  Including petitioner, there were a total of five partners in IWF.

In 1990, a dispute arose among the partners regarding the allocation of a $3 million distribution to be made by IWF. Petitioner sued the other partners in order to resolve the

---

[2]  Sec. 6404(i) was originally enacted as sec. 6404(g) by the Taxpayer Bill of Rights 2 (TBOR 2), Pub. L. 104-168, sec. 302, 110 Stat. 1457 (1996).  Sec. 6404(g) was redesignated as sec. 6404(i) by the Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, secs. 3505(a), 3309(a), 112 Stat. 743, 745.  However, Title XXVII of the Tax Court Rules of Practice and Procedure, dealing with actions for review of failure to abate interest, continues to reflect the original statutory designation.

dispute.  Pursuant to a court order, petitioners received a distribution in 1993 from IWF in the amount of $206,000.

In order to gauge their Federal income tax liability for 1993, petitioners consulted with a certified public accountant, Brian Ringler, who provided petitioners with his estimate of their liability.  Thereafter, in September 1993, petitioners made an estimated tax payment in the amount of $30,000.  In January 1994, petitioners made a second estimated tax payment in the amount of $2,360.

In April 1994, petitioners received Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., from IWF.  The Schedule K-1 revealed that petitioner's distributive share of partnership income was as follows:

| | |
|---|---|
| Ordinary Income | $262,045 |
| Other Portfolio Income | -85,000 |
| Schedule E Activity Income | 177,045 |
| Interest (investment income) | 45,581 |

Petitioners retained Brad Gillespie, a certified public accountant, to prepare their Federal income tax return for 1993.  Relying on the aforementioned Schedule K-1 and other information, Mr. Gillespie determined petitioners' tax liability as follows:

```
Total tax                              $62,602
Less: estimated tax payments
        Sept. 1993    $30,000
        Jan.  1994      2,360        -32,360
Less: deferral of additional
        1993 taxes[1]                  -1,963
Balance                                28,279
Plus: estimated tax penalty              111
Amount owed                            28,390
```

[1]For 1993, taxpayers could elect to defer two-thirds of their additional 1993 taxes that were due solely to the rate increases reflected in the 1993 tax rate schedules.  Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13201(d), 107 Stat. 459-461.  Petitioners so elected by attaching Form 8841, Deferral of Additional 1993 Taxes, to their timely filed return.

Petitioners remitted $500 with their 1993 return, but they made no further payment against their tax liability until August 1997.  See infra "E".

By notice dated June 13, 1994, respondent notified petitioners that they did not qualify for deferral of additional 1993 taxes because they had failed to make sufficient payment toward their reported liability.[3]  Respondent also notified petitioners that the amount owed was $31,602, determined as follows:

```
Tax as reported                        $62,602.00
Less: Estimated tax payments           -32,360.00
        Payment with return              -500.00
Unpaid tax                             29,742.00
Plus: estimated tax penalty            1,224.45
        Late payment penalty             297.42
        Interest                         338.41
Amount owed                            31,602.28
```

Finally, respondent requested that petitioners pay the amount

[3]  In order to qualify for deferral of additional 1993 taxes, a taxpayer was required to pay at least 90 percent of a specified liability.  See Notice 93-51, 1993-2 C.B. 337.

owed by June 23, 1994, in order "to avoid more interest and penalties."

B.  Petitioners' Attempts To Obtain a Loan

In 1994, petitioners tried three times to obtain a loan in order to satisfy their outstanding tax liability.

Prior to April 28, 1994, petitioners applied for a $200,000 home equity line of credit from Union Bank.  By statement dated April 28, 1994, Union Bank declined to extend credit to petitioners for the following reasons:  (1) "Income insufficient for amount of credit requested" and (2) "Excessive obligations in relation to income".

Prior to May 25, 1994, petitioners applied for a "home equity line of credit increase" from First Interstate Bank.  By letter dated May 25, 1994, First Interstate Bank declined petitioners' application for the following reasons:  (1) "Your obligations are excessive" and (2) "Your credit history of making payments when due is not satisfactory."

Prior to August 5, 1994, petitioners applied for a home equity loan from The Prudential Savings Bank, F.S.B.  By notice dated August 5, 1994, The Prudential Savings Bank denied petitioners' request for credit for the following reason:  "Insufficient income for amount of credit requested".

C.  The Collection Process

By letter dated July 14, 1994, petitioner acknowledged receipt of respondent's notice dated June 13, 1994, requesting payment of petitioners' outstanding tax liability.  Petitioner stated that he was "unable to pay the full amount at this time" and that he "would like to explore the opportunity of paying the tax in installments or some other mutually agreeable alternative."

By letter dated September 2, 1994, respondent replied to petitioner's aforementioned letter, stating in part as follows:

> Because of the amount you still owe on your current installment agreement, we need to review your financial condition.  Please complete the enclosed Form 433-F, Collection Information Statement, and return it within 10 days.

Whether petitioners ever returned Form 433-F to respondent is not established by the record, nor is there any indication that the parties ever had any further discussion regarding an installment agreement for the taxable year 1993.

By notices dated October 17, 1994, November 21, 1994, and December 26, 1994, respondent continued to advise petitioners that payment of their 1993 tax liability was overdue.  Indeed, the third such notice advised petitioners of respondent's intent to levy if petitioners failed to pay their tax liability.

By letter dated February 22, 1995, petitioners were advised that their case had been transferred to respondent's Problem

Resolution Office in order to "better serve you in clearing up the problem you are having with your taxes."[4]  Linda Caballero, a problem resolution technician, was assigned to petitioners' case. Ms. Caballero requested that petitioners complete Form 433-A, Collection Information Statement for Individuals, and Form 433-B, Collection Information Statement for Businesses.  Petitioners completed Forms 433-A and 433-B and forwarded the forms to Ms. Caballero.

After reviewing Forms 433-A and 433-B and accepting the information therein at face value, Ms. Caballero informed petitioners as follows:

> This letter confirms our telephone conversation on 12-21-95 concerning your 1993/1040 tax liability.  Based on the financial information statement you submitted, I have determined that you are currently unable to make payments toward your tax liability.  Therefore, your account is being placed in a currently uncollectible status.[1]  * * * this suspension is temporary and interest and/or penalties will continue to accrue until the tax is paid in full.  In addition, * * * a Federal Tax lien is being filed to protect the government's interest in this matter.[2]

[1]When a taxpayer's account is placed in uncollectible status, the Commissioner does not attempt to enforce collection against the taxpayer.

[2]On Feb. 21, 1996, respondent filed a Notice of Federal Tax Lien with the County Recorder for Orange County in Santa Ana, California.  The lien was released on Sept. 14, 1997, shortly

[4]  On Mar. 8, 1995, shortly after petitioners' account had been transferred to the Problem Resolution Office, respondent served a notice of levy on First Interstate Bank of California. The levy was released on Mar. 20, 1995, presumably because petitioners' case had been transferred to the Problem Resolution Office, without the collection of any funds.

after petitioners' 1993 liability was fully satisfied. See _infra_ "E".

> At this time we are closing your case out of the Problems Resolution Program and apologize for any inconvenience we may have caused you.

Petitioners' 1993 account remained in uncollectible status until July 11, 1997.

## D. Petitioners' Efforts To Compromise Their 1993 Tax Liability

By virtue of section 7122(a), the Commissioner is authorized to compromise a taxpayer's tax liability. Pursuant to that authority, the Commissioner has published directives regarding offers in compromise.[5] See Internal Revenue Manual (IRM), sec. 57(10)0 (Feb. 26, 1992) et seq. Form 656, Offer in Compromise, is the form that respondent has designed for use by a taxpayer who wishes to submit an offer in compromise.

When an offer in compromise is received from a taxpayer, a determination is made by an offer technician whether the offer is "processable". IRM, sec. 57(10)9.1(1) (Feb. 26, 1992). An offer that is processable is assigned to a collection officer, typically a revenue officer, for investigation and evaluation. An offer that is "unprocessable" is returned to the taxpayer.

---

[5] We note that the enactment of sec. 7122(c), relating to the evaluation of offers in compromise, because it applies to offers in compromise submitted after July 22, 1998, does not apply in this case. The same is true of the temporary regulations published thereunder, which are applicable to offers in compromise submitted on or after July 21, 1999, through July 19, 2002. See sec. 301.7122-1T(j), Temporary Proced. & Admin. Regs., 64 Fed. Reg. 39027 (July 21, 1999).

IRM, sec. 57(10)9.1(1)-(2) (Feb. 26, 1992).

An offer is unprocessable if:  (1) The taxpayer is not identified; (2) the liabilities to be compromised are not identified; (3) no amount is offered; (4) appropriate signatures are not present; (5) financial statement is not provided; (6) the offer does not reasonably reflect net equity in assets on Forms 433-A and 433-B and amounts recoverable from future income sources, as reflected on financial statements;[6] (7) an obsolete Form 656 is used; or (8) the taxpayer alters the terms on Form 656.  IRM, sec. 57(10)9.1(3) (Feb. 26, 1992).

1.  Petitioners' First Offer in Compromise

On September 19, 1994, petitioners submitted Form 656, offering to compromise their 1993 tax liability for $5,000 on the ground of doubt as to collectibility.  Petitioners submitted Forms 433-A and 433-B in support of their offer.

By letter dated December 20, 1994, respondent advised

---

[6]  However, the Internal Revenue Manual cautions:

judgment should be exercised when deciding whether to return an offer as unprocessable for this reason alone. It may be desirable to receive an offer into inventory which does not technically meet this criterion.  This would apply if the amount offered is close enough to the sum of net equity from Forms 433-A and 433-B, and amounts recoverable from future income sources that successful negotiation with the taxpayer could be pursued.

IRM, sec. 57(10)9.1(3)(f) (Feb. 26, 1992).

petitioners that their offer could not be considered because "The financial information you provided shows you have sufficient equity and/or income to pay the liability in full now or by an installment agreement."

By a second letter, also dated December 20, 1994, respondent invited petitioners to attend a workshop on January 17, 1995, regarding the preparation of offers in compromise. Petitioners were informed:

> The goal of this workshop is to assist you in preparing an offer in compromise that can be processed for further investigation by the Service. * * * Attending the workshop does not guarantee acceptance of your offer, but it will give you important information and assistance.

Petitioner attended the workshop.

2. Petitioners' Second, Third, and Fourth Offers in Compromise

On February 14, 1995, respondent received a second offer in compromise from petitioners. On March 22, 1995, respondent mailed a letter to petitioners informing them that their second offer could not be processed.

On April 26, 1995, respondent received a third offer in compromise from petitioners. On May 31, 1995, respondent mailed a letter to petitioners informing them that their third offer could not be processed.

On July 12, 1995, respondent received a fourth offer in compromise from petitioners. On August 10, 1995, respondent

mailed a letter to petitioners informing them that their fourth offer could not be processed.

### 3. Petitioners' Fifth Offer in Compromise

On August 24, 1995, respondent received a fifth offer in compromise from petitioners. On September 26, 1995, respondent mailed a letter to petitioners informing them that their fifth offer could not be processed for a variety of reasons, including the following:

> You didn't correctly identify the liability(s) that you want to compromise. Please see Form 656, and refer to page 6, "How to Complete Form 656", item 4.

> You didn't attach Form 433A, Collection Information Statement for Individuals and/or Form 433B, Collection Information Statement for Businesses.

> Please fill out a new 433A, the financial information is over a year old. If your wife still owns a business you will need a 433B also. Your tax liability for 1994 must also be listed on the Form 656.

### 4. Petitioners' Sixth Offer in Compromise

On October 4, 1995, respondent received a sixth offer in compromise from petitioners. On November 1, 1995, respondent mailed a letter to petitioners informing them that their sixth offer could not be processed for the following reason:

> The amount you offered doesn't equal or exceed the minimum offer as described on Form 656, page 5, "How to Figure an Acceptable Offer". You must offer an amount which equals or exceeds the sum of (a) the amount shown on line 30, Form 433-A, Collection Information Statement for Individuals and/or line 27 column D, Form 433-B, Collection Information Statement for Businesses

and (b) the amount we could collect from your present and future income as shown on page 4 of the Collection Information Statement.

5. Petitioners' Seventh Offer in Compromise

On November 20, 1995, respondent received a seventh offer in compromise from petitioners. Respondent determined that petitioners' seventh offer could be processed and so advised petitioners by letter dated January 9, 1996.

a. Investigation of the Seventh Offer

The investigator assigned to review and evaluate petitioners' offer was Revenue Officer Dewey Marine (Mr. Marine). On May 9, 1996, Mr. Marine requested additional information from petitioners in order to determine whether the amount of their offer ($16,200) was adequate. Petitioners did not provide the requested additional information within the specified time period.

b. Rejection of the Seventh Offer

By letter dated May 31, 1996, respondent rejected petitioners' seventh offer because "you haven't given us enough information to determine if the amount of your offer is adequate."

c. Reconsideration of the Seventh Offer

By letter dated June 6, 1996, petitioner provided the additional information previously requested and asked Mr. Marine

to reconsider petitioners' seventh offer.  Mr. Marine agreed to do so.

On February 12, 1997, Mr. Marine rejected petitioners' seventh offer on the ground that the amount of the offer was inadequate.  In this regard, Mr. Marine determined that petitioners could afford to pay more, at least for offer in compromise purposes, than what they had offered to pay.  Mr. Marine based this conclusion on his determination of the differential between petitioners' monthly income and petitioners' necessary living expenses.  In determining petitioners' necessary living expenses, Mr. Marine considered, inter alia, costs for housing and utilities, educational costs for petitioners' children, and costs for life insurance.

Mr. Marine determined costs for housing and utilities by reference to "local standards" that were developed by respondent's National Office, based on data provided by the Census and the Bureau of Labor Statistics, and published in the Internal Revenue Manual on November 2, 1995.  IRM, sec. 5323.433(3)(a).  Because petitioners' actual costs for housing and utilities exceeded the maximum allowance set forth in the local standards for Orange County, California, Mr. Marine utilized the local standards.[7]

---

[7]  In discussing the purpose behind the local standards, Internal Revenue Manual, sec. 5323.433(3)(a)(1)-(3) (Nov. 2,
(continued...)

Mr. Marine also determined that certain "life-style choices" made by petitioners, namely, petitioners' purchase of whole life insurance rather than less costly term insurance and petitioners' decision to send their children to private rather than public school, gave rise to increased expenses that could not be considered in determining petitioners' necessary living expenses for offer in compromise purposes.

### d. The Final Exchange of Correspondence

Petitioner was advised that the seventh offer had been rejected in a telephone call initiated by Mr. Marine on February 12, 1997. Petitioner was also advised of the bases on which the offer had been rejected, specifically including Mr. Marine's application of the local standards for housing and utilities. Prior to this conversation, petitioner had not been aware of the local standards.

---

[7](...continued)
1995) provides in part as follows:

> The housing and utilities standard will provide the basis for determining whether a taxpayer will be required to pay the Service an amount equal to excessive or not-allowable housing expenses. When deciding whether a taxpayer should be required to pay the Service an amount equal to excessive or not-allowable housing expenses, consider:
>     (1) the increased cost of transportation to work and school which would result from moving to lower-cost housing;
>     (2) the tax consequences which would result from selling a home. * * * ; and
>     (3) the cost of moving to a new residence.

On February 14, 1997, petitioner faxed Mr. Marine a letter dated February 13, 1997. The letter acknowledged:

> The rejection of my offer is based largely upon the surplus between my living expenses as you have calculated them and my current monthly income. A significant part of that evaluation involves the government-imposed housing expense limit of $1500.00[1] per month, which as you indicated is in reality quite low.
>
> [1]Actually, $1,568.

The letter also proposed that petitioners' outstanding liability "be capped at the original amount of the remaining tax balance, $29,600,[8] payable in 60 equal monthly payments of $500.00".

By letter dated February 18, 1997, Mr. Marine advised petitioner that his proposal to "cap" petitioners' outstanding liability could not be honored because of the statutory requirement that "interest and penalty be collected on delinquent liabilities." The letter concluded as follows:

> As we discussed in our recent telephone conversation, your ability to make payments (based on Offer in Compromise criteria) is the major stumbling block in the consideration of your offer. Your "life-style choices", although commendable, on the expenditure of your available funds will always be a deterrent.
>
> The offer program is meant for those who truly do not have the assets or ability to pay. Clearly, this is not the case with you.
>
> Should you have any further questions, please feel free to contact me. Perhaps an installment agreement can be made with the office closest to you.

---

[8] Actually, $29,742. See supra p. 4.

E.  Payment of Petitioners' Tax Liability

By letter dated August 18, 1997, petitioners informed respondent that they had obtained a loan to satisfy their outstanding tax liability for 1993.  Shortly thereafter, on August 27, 1997, petitioners paid their liability in full.

F.  Notice of Determination and Commencement of Litigation

By notice of determination dated May 9, 2000, respondent disallowed, in full, petitioners' request for abatement of interest[9] on the ground that "We found no ministerial errors or delays on the part of the Internal Revenue Service that warrant abatement of interest in your case."

On November 6, 2000, petitioners commenced an action in this Court by filing a petition, pursuant to section 6404(i) and Rules 280-284, for review of respondent's failure to abate interest with respect to the taxable years 1993.[10]

OPINION

In general, interest on an underpayment of income tax begins

---

[9]  The evidentiary record does not include a copy of petitioners' request for abatement.

[10] In pertinent part, sec. 6404(i) provides that "The Tax Court shall have jurisdiction over any action brought by a taxpayer who meets the requirements referred to in sec. 7430(c)(4)(A)(ii) to determine whether the Secretary's failure to abate interest under this section was an abuse of discretion, and may order an abatement, if such action is brought within 180 days after the date of the mailing of the Secretary's final determination not to abate such interest."  Petitioners meet the net worth requirements of sec. 7430(c)(4)(A)(ii), and their action was timely commenced.  See sec. 7502(a).

to accrue on the due date of the return for such tax and continues to accrue, compounding daily, until payment is made. See secs. 6601(a), 6622(a).

This Court may order an abatement of interest only if there is an abuse of discretion by the Commissioner in failing to abate interest. See sec. 6404(i), formerly sec. 6404(g). In order to demonstrate an abuse of discretion, a taxpayer must prove that the Commissioner exercised his discretion arbitrarily, capriciously, or without sound basis in fact or law. See Rule 142(a); Lee v. Commissioner, 113 T.C. 145, 149 (1999); Woodral v. Commissioner, 112 T.C. 19, 23 (1999).

The Commissioner has the authority to abate, in whole or in part, an assessment of interest on a payment of income tax to the extent that an error or delay in such payment is attributable to an officer or employee of the Internal Revenue Service (IRS), acting in his or her official capacity, being erroneous or dilatory in performing a ministerial act. See sec. 6404(e)(1)(B).[11] An error or delay by the Commissioner can be taken into account only: (1) If it occurs after the Commissioner

---

[11] Sec. 6404(e) was amended in 1996 by TBOR 2 sec. 301, 110 Stat. 1457 (1996), to permit the Commissioner to abate interest with respect to an "unreasonable" error or delay resulting from "managerial" or ministerial acts. The amendment applies to interest accruing with respect to deficiencies or payments for taxable years beginning after July 30, 1996; accordingly, the amendment is inapplicable in the present case. See Woodral v. Commissioner, 112 T.C. 19, 25 n.8 (1999).

has contacted the taxpayer in writing with respect to the payment and (2) if no significant aspect of the error or delay is attributable to the taxpayer.  See sec. 6404(e)(1); Krugman v. Commissioner, 112 T.C. 230, 239 (1999); Nerad v. Commissioner, T.C. Memo. 1999-376.

Congress did not intend for section 6404(e) to be used routinely.  Accordingly, we order abatement only "where failure to abate interest would be widely perceived as grossly unfair."

In order for petitioners to prevail, there must be an error or delay in payment that is attributable to respondent's being erroneous or dilatory in performing a ministerial act.[12]  A "ministerial act" does not involve the exercise of judgment or discretion.  Sec. 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987).  Rather, a ministerial act means a procedural or mechanical act that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as conferences and review by supervisors, have taken place.  See id.  Examples of ministerial acts are provided in the regulations.  See sec. 301.6404-2T(b)(2), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987).  In contrast, a decision concerning the proper application of Federal tax law, or

---

[12]  Further, an abatement of interest "only applies to the period of time attributable to the failure to perform the ministerial act."  H. Rept. 99-426, at 844 (1985), 1986-3 C.B. (Vol. 2) 1, 844; S. Rept. 99-313, at 208 (1986), 1986-3 C.B. (Vol. 3) 1, 208.

other applicable Federal or State law, is not a ministerial act.
See sec. 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs.,
supra.  The mere passage of time does not establish error or
delay in performing a ministerial act.  Scott v. Commissioner,
T.C. Memo. 2000-369; Hawksley v. Commissioner, T.C. Memo. 2000-
354.

In their petition, petitioners request that "all interest
associated with this tax year" be abated.[13]  However, at trial
and on brief, petitioners narrowed the scope of their request,
identifying a specific period of time over which interest should
be abated; namely, the period from the date on which the first
offer in compromise was submitted (September 19, 1994) to the
date on which petitioners first learned of the local standards
for housing and utilities (February 12, 1997).  We observe that
the September 19, 1994, date is after the date on which
respondent first contacted petitioners in writing with respect to
their unpaid tax liability for 1993.  See sec. 6404(e)(1).

---

[13]  Sec. 6404(e) requires not only that a taxpayer identify
an error or delay caused by a ministerial act on the
Commissioner's part, but also identify a specific period of time
over which interest should be abated as a result of such error or
delay.  See Donovan v. Commissioner, T.C. Memo. 2000-220.  In the
petition, petitioners did not focus on this correlation between
the error or delay attributable to a ministerial act on
respondent's part and a specific period of time; rather,
petitioners essentially requested that all interest with respect
to the taxable year 1993 be abated.  Such request is, in effect,
a request for an exemption from interest, rather than a request
for an abatement of interest.  However, the scope of such request
is beyond that contemplated by the statute.  See id.

We turn now to petitioners' contentions, as best we understand them, in support of their argument that interest should be abated for the period from September 19, 1994, to February 12, 1997.

Petitioners contend that application of the local standards for housing and utilities to a taxpayer's offer in compromise is a ministerial act that does not require the exercise of discretion and that respondent committed a "ministerial error" by failing to apply the local standards to petitioners until they submitted their seventh offer. We disagree for several reasons.

First, we are not convinced that the premise of petitioners' contention is correct. Although application of the local standards for housing and utilities is, in the first instance, mechanical in nature, the revenue officer is nonetheless authorized to decide whether a taxpayer should be required to pay an amount equal to excessive or unallowable housing expenses or, in contrast, whether the taxpayer should be allowed an amount in excess of the local standard. In this regard, respondent instructs each revenue officer to consider three specific factors in making this determination.[14]

Second, the local standards for housing and utilities that are in issue in this case were not published in the Internal Revenue Manual until November 2, 1995. Petitioners' first six

---

[14] See _supra_ note 7.

offers were all determined by respondent to be unprocessable before that date. Accordingly, it would not have even been possible for respondent's agents to apply the local standards to those six offers.

Third, even if respondent's agents could have divined the future publication of the local standards, respondent's agents would not have had the opportunity to apply them to petitioners' first six offers because those offers were determined to be unprocessable. In other words, those offers were never assigned to a revenue officer for investigation and evaluation on their merits.

Fourth, and most importantly, application of the local standards was but one step in the process of investigating and evaluating petitioners' offer in compromise, a process that repeatedly called for the exercise of judgment and discretion on the part of the revenue officer. In contrast, a ministerial act does not involve the exercise of judgment or discretion. Sec. 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., supra. We reject petitioners' attempt to dissect a unitary process into a series of unrelated and independent steps.

Petitioners also contend that respondent erred by not informing them of the local standards for housing and utilities

until February 12, 1997.[15]  To the extent that petitioners seek
to imply that they would have, and could have, paid their
outstanding liability any earlier than August 27, 1997, had they
known that their efforts to compromise such liability would
ultimately prove to be unsuccessful, we reject such implication
because it is unsupported by the record.  See Hawksley v.
Commissioner, supra.  Indeed, when asked by the Court at trial
what petitioners would have done differently had they known about
the local standards at an earlier date, petitioner stated that he
was not aware of any option other than to have sold his home.
The candidness of this statement is borne out by the fact that
petitioners did not make a single payment of tax after filing
their return until August 27, 1997, and by the fact that
petitioners' account was in uncollectible status for much of the
time that is relevant to this case.

In conclusion, the record does not reveal any error or delay
in payment of petitioners' 1993 tax liability that is
attributable to respondent's being erroneous or dilatory in
performing a ministerial act.  Accordingly, we hold that
respondent did not abuse his discretion in refusing to abate
interest.

---

[15]  Implicit in petitioners' contention is the notion that
respondent is under a duty to inform a taxpayer of the local
standards and that the fulfillment of such duty is a ministerial
act.  We need not, however, decide either matter.

In order to give effect to our disposition of the disputed issue,

Decision will be entered for respondent.